**PUBLIC OFFICERS AND EMPLOYEES**

**ELECTED OFFICIALS – REMOVAL FROM OFFICE – DELEGATE'S CONVICTION AND WAIVER OF APPEAL RIGHTS TRIGGERS AUTOMATIC REMOVAL UNDER ARTICLE XV, § 2 OF THE MARYLAND CONSTITUTION DESPITE CIRCUIT COURT'S SUBSEQUENT REVISION OF SENTENCE TO PROBATION BEFORE JUDGMENT**

November 20, 2012

*The Honorable Martin O'Malley*
*Governor*

You have asked for our opinion as to whether Delegate Tiffany Alston has been removed from office by operation of law as a result of her recent criminal conviction. Specifically, you have asked us to review the conclusion reached by Dan Friedman, Counsel to the General Assembly, that Ms. Alston's conviction for misconduct in office constitutes an offense that triggers the automatic removal provisions of Article XV, § 2 of the Maryland Constitution. After a thorough review of Mr. Friedman's analysis of the issue and the response thereto from Ms. Alston's counsel, and after considering events that have transpired in the days since Mr. Friedman issued his letter, we conclude that Ms. Alston was removed from office, by operation of law, by virtue of her conviction for official misconduct and her waiver of her rights of appeal.

In reaching this conclusion we are mindful of the fact that the trial judge, after sentencing Ms. Alston to probation, community service, and restitution, subsequently granted Ms. Alston's motion to modify her sentence pursuant to Rule 4-345 and granted her probation before judgment after she had demonstrated that she had completed her community service obligations and paid restitution. The trial court's exercise of its revisory power, however, does not amount to a determination that the conviction was wrongly imposed, as would be the case if the trial court's judgment were "reversed or overturned" on appeal. Because Ms. Alston's conviction was finally imposed, and was not reversed or overturned on appeal, we agree with Mr. Friedman's conclusion that she was removed from office effective October 9, 2012.

# I

# Background[1]

*Ms. Alston's Conviction and Sentencing*

Tiffany Alston was first sworn in as a member of the Maryland House of Delegates representing the 24th legislative district on January 11, 2011. On or about September 23, 2011, the grand jury for Anne Arundel County returned a five-count indictment against Ms. Alston for using campaign funds belonging to the campaign finance entity, "Friends of Tiffany Alston," for her private benefit, including payments to herself and an employee of her law firm, and for her wedding expenses ("Alston I"). The indictment indicates that each of the criminal acts was alleged to have occurred between April 6 and December 23, 2010, before Ms. Alston was sworn into office.

On December 15, 2011, the grand jury returned an additional two-count indictment against Ms. Alston ("Alston II") charging her with theft under $1,000 and common law misconduct in office based on allegations that Ms. Alston used State money to pay an employee for work at her private law firm. *See Duncan v. State*, 282 Md. 385, 387 (1978) (describing common law misconduct in office as "corrupt behavior by a public officer in the exercise of the duties of his office or while acting under color of his office"). Unlike the Alston I indictment, the Alston II indictment alleged criminal acts that occurred during Ms. Alston's term of office.

The two cases were set for separate trial dates before the Honorable Paul F. Harris, Jr. of the Circuit Court for Anne Arundel County. Alston II was scheduled for trial first and, on June 12, 2012, a jury returned a guilty verdict on both counts: misdemeanor theft and misconduct in office. Judge Harris deferred sentencing until November 5, 2012. Trial of Alston I was scheduled to begin on October 9, 2012. Rather than proceed to trial, however, on October 9, 2012, Ms. Alston entered into a plea agreement to resolve both Alston I and sentencing in Alston II.

For purposes of this opinion, the critical terms of the agreement approved by Judge Harris are:

- On the fraudulent misappropriation by a fiduciary count of Alston I, Ms. Alston pled *nolo contendere* or "no contest." Judge

---

[1] Because we have provided this Opinion on an expedited basis, our description of the circumstances surrounding Ms. Alston's prosecution and conviction is based entirely on the facts as described by Mr. Friedman and by Ms. Alston's counsel.

Harris accepted the *nolo contendere* plea, but struck the guilty finding and stayed entry of judgment pursuant to CP § 6-220(b) ("probation before judgment"). Ms. Alston was also given three years of unsupervised probation and served with a civil citation in the amount of $500.

- On the misdemeanor theft charge of Alston II, on which she had been found guilty by the jury on June 12, Judge Harris also struck the guilty finding and granted Ms. Alston probation before judgment.

- On the misconduct in office charge of Alston II, Judge Harris sentenced Ms. Alston to one year of incarceration, suspended, 3 years of supervised probation, 300 hours of community service, and restitution to the State of Maryland in the amount of $800.

As part of the agreement, Ms. Alston waived all appellate rights. Ms. Alston's waiver is recorded on the criminal hearing sheets pertaining to her charges.

Finally, the letter agreement also contained a provision allowing Ms. Alston to "earn" a modification of her sentence for the misconduct in office charge of Alston II:

> The Defendant may seek a Modification of Sentence requesting probation before judgment on the misconduct in office conviction. The State shall remain silent and the Court agrees to bind itself to striking the guilty conviction and granting Ms. Alston probation before judgment on Count 2 in case #K-11-2626 immediately upon (i) completion of three hundred hours of community service, (ii) payment of $800.00 in restitution, and (iii) payment of a non-criminal civil citation fine in the amount of $500.

Despite the quoted text of the letter agreement, Judge Harris stated in open court, on October 9, 2012, that he was *not* bound to grant the modification, though he would entertain it once she had fulfilled the terms of her sentence. Ms. Alston promptly filed the necessary motion for modification and asked that it be held *sub curia* pending completion of the community service and payment of the restitution.

*Mr. Friedman's Advice on the Suspension and Removal of Ms. Alston*

On October 10, 2012, Mr. Friedman advised Speaker Busch that, by virtue of Ms. Alston's having received a sentence for the crime of misconduct in office, Ms. Alston had been "suspended from elective office by operation of law without pay or benefits." Letter of Advice from Dan Friedman, Assistant Attorney General, to the Honorable Michael E. Busch, Speaker of the House of Delegates (Oct. 10, 2012). It is our understanding that Speaker Busch relied upon this advice and has since taken the necessary steps to effectuate the suspension. The propriety of Ms. Alston's initial suspension is not at issue and is not addressed in this Opinion.

Because of the urgent need to ascertain Ms. Alston's status, Mr. Friedman provided the Speaker with expedited advice on the pressing issue of Ms. Alston's suspension and left for another day the issue of whether Ms. Alston's conviction had resulted in her permanent removal from office. The need for advice on the removal issue soon arose, however, and Mr. Friedman provided a second letter of advice, dated November 1, 2012, in which he concluded that Ms. Alston had been removed from office by operation of law by virtue of her conviction on the misconduct in office charge and her waiver of appellate rights with respect thereto. It is the conclusion that Mr. Friedman reached in this second letter of advice that you have asked us to review.

*The Trial Court's Modification of Ms. Alston's Sentence*

It is our understanding that a hearing on Ms. Alston's motion for modification was held on November 5, 2012, at which point Ms. Alston stated that she had paid the restitution and had completed her community service obligations. After the State Prosecutor proffered evidence to the contrary, the case was continued to November 13, 2012, at which point Ms. Alston indicated that she had carried out additional community service since her previous court appearance. Judge Harris granted the motion for modification, struck the finding of guilt, and entered probation before judgment on the one count—misconduct in office—for which she had been sentenced. Ms. Alston remains under three years of supervised probation.

## II

## Analysis

### *A.    The Relevant Constitutional Provision*

Article XV, § 2 of the Maryland Constitution provides for the suspension and removal of elected officials who are convicted of certain crimes:

> Any elected official of the State, or of a county or of a municipal corporation who during [her] term of office is convicted of or enters a plea of nolo contendere to any crime which is a felony, or which is a misdemeanor related to [her] public duties and responsibilities and involves moral turpitude for which the penalty may be incarceration in any penal institution, shall be suspended by operation of law without pay or benefits from the elective office.  During and for the period of suspension of the elected official, the appropriate governing body and/or official authorized by law to fill any vacancy in the elective office shall appoint a person to temporarily fill the elective office, provided that if the elective office is one for which automatic succession is provided by law, then in such event the person entitled to succeed to the office shall temporarily fill the elective office.  If the conviction becomes final, after judicial review or otherwise, such elected official shall be removed from the elective office by operation of Law and the office shall be deemed vacant.  If the conviction of the elected official is reversed or overturned, the elected official shall be reinstated by operation of Law to the elective office for the remainder, if any, of the elective term of office during which [she] was so suspended or removed, and all pay and benefits shall be restored.

Md. Const., Art. XV, § 2.  This provision creates a two-step process:  An elected official who is convicted of a qualifying crime is suspended; if the conviction is "reversed or overturned" the elected official is reinstated to office, but if the conviction "becomes final," *i.e.*, is upheld "after judicial review," the removal becomes permanent.[2]

---

[2] During the 2012 legislative session, the General Assembly unanimously proposed a constitutional amendment that substantially

## B. Removal Analysis

Mr. Friedman concluded that Ms. Alston was removed from office by virtue of having been convicted of common law misconduct in office. Mr. Friedman expressed "no doubt" that this is a qualifying crime under Article XV, § 2 and that, upon Judge Harris's imposition of a sentence, the charge became a "conviction" and thus became a proper basis for her suspension from the legislature under Article XV, § 2. *See* 62 *Opinions of the Attorney General* at 371. These conclusions do not appear to be in question here and we see no basis on which to doubt their accuracy.[3]

The question you have asked us to review can be distilled to whether Ms. Alston's conviction has "become[] final, after judicial review or otherwise," thus causing her to be permanently removed from elective office, or whether the trial court's subsequent modification of her sentence to probation before judgment means that her conviction has been "reversed or overturned," thereby allowing Ms. Alston to be reinstated. It is our view that the former is the case and that Ms. Alston's conviction was rendered final by virtue of her receiving a conviction and, simultaneously, forfeiting her appellate rights and by her failure to file any residual appeal she may have had within the thirty days allowed under Rule 8-202(a). At that time, Ms. Alston's conviction was final and could no longer be "reversed or

---

modified Art. XV, § 2 by (1) accelerating the trigger for suspension from "conviction," which occurs at sentencing, 62 *Opinions of the Attorney General* 365, 371 (1977), to the time of a guilty verdict; and (2) mandating immediate and automatic removal for guilty pleas and *nolo contendere* pleas for qualifying crimes. 2012 Md. Laws, ch. 147. On November 6, 2012, the voters adopted the new constitutional amendment by a greater than seven to one margin. *See* Unofficial 2012 Presidential General Election results for All State Questions (available at http://elections.state.md.us/elections/2012/results/general/gen_qresults_2012_4_00_1.html (last visited Nov. 19, 2012)) (reporting that 88% voted to approve Question 3). The amendment will become effective upon the Governor's proclamation that it has been adopted by the voters. Art. XIV, § 1.

[3] We also do not express an opinion on Mr. Friedman's conclusion that the other charges on which Ms. Alston was found guilty could not serve as the basis of suspension or removal. With respect to her misdemeanor theft charge, Mr. Friedman concluded that the charge had not become a "conviction" because Ms. Alston received probation before judgment. With respect to her charge of misappropriation by a fiduciary, Mr. Friedman stated that, while the issue "is not entirely clear at this time," he believed that, because the count related to the use of her campaign funds, it was not "'related to [her] public duties and responsibilities.'"

overturned" by an appellate court so as to allow her to be reinstated.  Rather, her conviction became final, not by "judicial review," but "otherwise," by her waiver of, and failure to exercise, her appeal rights.

### 1.    Interpretation of Article XV

Inasmuch as this issue raises a matter of constitutional construction, we believe it helpful to review the analysis that the Court of Appeals has prescribed when interpreting "a particular provision, be it statutory, constitutional or part of the Rules":

> We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.  If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions, and our analysis ends.  If, however, the language is subject to more than one interpretation, or when the language is not clear when it is part of a larger statutory scheme, it is ambiguous, and we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, and statutory purpose, as well as the structure of the statute.

*People's Ins. Counsel Div. v. Allstate Ins. Co.*, 408 Md. 336, 351 (2009) (internal quotation marks omitted).  The interpretation of Article XV invokes all of these interpretive steps.

We believe the plain language and structure of Article XV, § 2, when read as a whole, describes a binary outcome:  When an elected official is convicted of a qualifying crime, she is suspended from office pending any appeal.  In that event, "[i]f the conviction of the elected official is reversed or overturned, the elected official shall be reinstated by operation of Law."  If, however, "the conviction becomes final, after judicial review or otherwise, such elected official shall be removed from the elective office by operation of Law and the office shall be deemed vacant."  When these passages are read together, the natural meaning thereof becomes clear:  If the official wins her appeal, she is reinstated; if she loses her appeal or fails to appeal altogether, she is removed.  This binary interpretation does no violence to the words of Article XV and is consistent with how we have previously characterized the effect of the provision.  *See, e.g.*, 62 *Opinions of the Attorney General* 365, 368 (1977) (describing the legislative history of Article XV and observing

that the final version of the amendment "established a suspension-removal procedure under which suspension from office would occur upon conviction of a crime and removal would occur if the conviction were upheld on appeal"); 62 *Opinions of the Attorney General* 464, 477 (1977) (observing that Article XV specifically contemplates "the possible reinstatement to office of an official whose conviction is overturned on appeal").

When we apply this interpretation to the facts of Ms. Alston's prosecution as we understand them, her conviction became final, not by "judicial review," but "otherwise," because she waived her right to appeal her conviction. We realize in this respect that criminal defendants retain certain limited rights to appeal their convictions even in cases where they have seemingly waived all rights of appeal. *See*, *e.g.*, Md. Code Ann., Cts. & Jud. Proc. § 12-302(e) (allowing for review of judgment entered following a plea of guilty). But because Ms. Alston was found guilty of, as opposed to having pled to, the charge that resulted in her removal, she was required to file any such appeal—again, if one remained available—within 30 days of her conviction, Md. R. 8-202, which Ms. Alston failed to do. Thus, by the time Judge Harris exercised his revisory power and granted Ms. Alston probation before judgment, the conviction had become final for purposes of Article XV.

We are aware that the 1974 legislative history of Article XV, § 2 provides some support for the view Ms. Alston espouses, namely, that the term "judicial review" is broader than "appeal." As initially introduced, the proposed constitutional amendment would have required permanent removal immediately upon conviction, "notwithstanding any *appeal* which may be taken." Senate Bill 671 (1974) (emphasis added). The Senate amended the proposal to create the two-step process of suspension and removal that we are now familiar with, and likewise made the process dependent on the outcome of an "appeal":

> If, after exhaustion of any *appeal* as a matter of right within the court system in which the elected official is so convicted, the conviction is upheld, such elected official shall be removed from the elective office by operation of law. . . . If the conviction of the elected official is reversed or overturned on any *appeal* as a matter of right as provided above, the elected official shall be reinstated by operation of law. . . .

*Maryland Senate Journal*, Vol. II at 1914 (1974) (emphasis added). The House of Delegates appears to have amended the proposal further to arrive at the current language, "becomes final, after judicial review or otherwise." *Maryland House Journal*,

Vol. II at 4365 (1974). The Senate then concurred in the House's amendment and it was that version that was approved by the voters. *Maryland Senate Journal*, Vol. II at 3072; *see also* 1974 Md. Laws, ch. 879.

We acknowledge that this history could be seen as evidence that the Legislature intended to make a distinction between an "appeal" and "judicial review," as Ms. Alston contends, and, consequently, that an argument could be made that the trial court's revisory power, though not an appeal, is encompassed within the term "judicial review." But we think such a construction places too much weight on a distinction that, we believe, was not intended.

As the Court of Appeals explained in *Gisriel v. Ocean City Board of Supervisors*, it was not uncommon in the early 1970s for the Judiciary and the Legislature alike to conflate the concepts of "appeal" and "judicial review":

> Section 12-302(a) [of the Courts & Judicial Proceedings Article] was enacted by the General Assembly in 1973, and the opinion in *Shell Oil Co. v. Supervisor*, [276 Md. 36 (1975)], was rendered two years later in 1975. Prior to the opinion in the Shell Oil case, and at the time § 12-302(a) was enacted, statutory circuit court actions for judicial review of decisions by administrative agencies or local legislative bodies were regularly called "appeals" and treated as if they fell within the appellate jurisdiction of the circuit courts. *See*, *e.g.*, *Criminal Inj. Comp. Bd. v. Gould*, [273 Md. 486 (1975)] (using, throughout the opinion, the terms "appeal" and "appellate" jurisdiction interchangeably with the term "judicial review").

345 Md. 477, 493 (1997). Although *Gisriel*, *Shell Oil*, and *Gould* involved distinctions between the circuit court's original and appellate jurisdiction with respect to the review of administrative agency action—an issue not at play here—the courts' conflation of the terms "appeal" and "judicial review" gives us reason to doubt that the Legislature intended the meaning of "judicial review" that Ms. Alston ascribes to it.

Perhaps more importantly, Ms. Alston's interpretation would require us to read the words "reversed or overturned" as including the word "modified" and require us to understand "revers[ing]" and "overturn[ing]" as actions that may be taken by a trial court.

In our view, these words are more normally and naturally understood as actions taken exclusively by appellate courts. We note in this respect that, while "judicial review" is still used to refer to a court's review of both agency decisions and lower court decisions, *See*, *e.g.*, *S. Easton Neighborhood Ass'n v. Town of Easton*, 387 Md. 468, 476 (2005) ("Further judicial review of the Circuit Court's order upholding the Town Council's decision to close Adkins Avenue cannot be maintained as an action for judicial review of an administrative agency's decision."), we are not aware of any instance in which it has been understood to refer to a court's review of its own decision.

The Maryland Rules bear this out. The Rules do not use the terms "reverse" or "overturn" to describe the circuit courts' actions with regard to their own judgments. *See*, *e.g.*, Md. R. 4-332(*l*) (using "set aside" for purposes of writs of actual innocence); 4-331 (using the terms "revise" and "set aside" for purposes of motions for new trial). Rule 4-345—which formed the basis for Judge Harris's revision of Ms. Alston's sentence—uses many words to describe its effect but never "reverse" or "overturn." *See generally* Md. R. 4-345 (using terms "correct," "modify," "reduce," "vacate," and "revise"). Given that the circuit courts do not engage in "judicial review" of their own decisions, we believe the term "judicial review," as used in Article XV, § 2, means "appeal."

> ## 2. A Trial Court's Modification of the Sentence it Imposed Does Not Constitute Judicial Review and Does Not "Reverse or Overturn" the Trial Court's Sentence.

We believe that the interpretation of Article XV that we reach is consistent with our understanding of motions for modification as collateral criminal remedies (a category which also includes post-conviction, writs of mandamus and coram nobis, and pardons and commutations) that may be granted after a criminal conviction becomes final. See generally Michael A. Millemann, *Collateral Remedies in Criminal Cases in Maryland, An Assessment*, 64 Md. L. Rev. 968 (2005). Historically, the power of Maryland trial judges to revise criminal sentences was unique, both as compared to other states and other areas of the law. *See* Steven Grossman & Stephen Shapiro, *Judicial Modification of Sentences in Maryland*, 33 U. Balt. L. Rev. 1 (2003). So long as a motion for modification was filed within 90 days of sentence and held sub curia by the trial court, it could be granted at any time thereafter. *Id.* at 4-7 (discussing *Greco v. State*, 347 Md. 423 (1997); *State v. Robinson*, 106 Md. App. 720 (1995)).

In 2004, the rule was modified to create the current 5-year limit on the trial court's revisory power, but during that 5-year

period, the trial judge remains free to modify any sentence on a timely filed motion:

> Upon a motion filed within 90 days after imposition of a sentence . . . in a circuit court, whether or not an appeal has been filed, the court has revisory power over the sentence except that it may not revise the sentence after the expiration of five years from the date the sentence originally was imposed on the defendant and it may not increase the sentence.

Md. R. 4-345(e)(1). Although the revisory power is now time-limited, Rule 4-345 does not limit the types of crimes to which it may be applied. As a result, the trial court could, upon the defendant's timely motion and at any time up to five years, exercise its revisory power to strike the lengthy prison term of an elected official convicted of manslaughter and grant him or her probation before judgment. Under Ms. Alston's reading of the law, the fact that such a motion was pending would forestall removal of the elected official, potentially for as long as four years—the duration of an elective term of office. Md. Const., Art. XVII, § 1 (limiting the terms of elected officials to 4 years). We believe that the potential for this and similar scenarios illustrates that the term "judicial review" cannot be interpreted to include the trial court's exercise of revisory power, and that the contrary conclusion would be impossible to reconcile with the public policy that lies behind Article XV.

Furthermore, like other collateral criminal remedies, the revisory power available under Rule 4-345 provides for remedies that may be granted after a criminal conviction becomes final, not before. *See State v. Griffiths*, 338 Md. 485, 496 (1995) (describing Rule 4-345 as providing "a method of opening a judgment otherwise final and beyond the reach of the court."). That Judge Harris "struck" Ms. Alston's guilty verdict and conviction and granted her probation before judgment does not mean that the conviction never occurred for purposes of Article XV. We realize that probation before judgment is not always considered a conviction when imposed at trial. *See Myers v. State*, 303 Md. 639, 647-48 (1985); *but see Abrams v. State of Maryland*, 176 Md. App. 600, 612 (2007) (discussing *Myers* and observing that, "[i]n later cases, whether a probation before judgment constituted a 'conviction' again depended on the context and purpose of the use of the term 'conviction'"); *id.* at 617 ("[W]e hold that, where a probation before judgment subjects a person to significant collateral consequences, such probation before judgment constitutes a 'conviction' for purposes of coram nobis relief."). But in this respect, timing is important. Had

Judge Harris granted Ms. Alston probation before judgment up front—as he did with respect to the guilty verdict on Ms. Alston's misdemeanor theft charge—she would not have received a "conviction" and would not have been removed pursuant to Article XV. But because Judge Harris sentenced Ms. Alston, she was "convicted" for purposes of Article XV and removed from office, and the court's later exercise of revisory power—whether within thirty days or thirty months after the conviction—cannot not undo that fact. The bell cannot be unrung.

### 3. The Legislative Purpose of Article XV Weighs Against the Interpretation Ms. Alston Advocates.

The reading we ascribe to Article XV furthers its primary purpose, which is plainly to remove from office those elected officials who are found guilty of crimes that undermine the public trust in and the integrity of the General Assembly.[4] As the Court of Appeals stated in *People's Counsel*, "[i]n statutory interpretation, our primary goal is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules." *People's Ins. Counsel Div.*, 408 Md. at 351 (internal quotation marks omitted).

It is important in this respect to recognize that Judge Harris expressly stated—both in open court and in court documents— that he was modifying Ms. Alston's sentence because she had fulfilled her rehabilitative obligations and not because he had changed his view as to her criminal responsibility. Modifying Ms. Alston's sentence in this respect may have been worthwhile from a correctional perspective; sentence modification can be a "powerful incentive" toward rehabilitation or restitution. *Judicial Modification of Sentences in Maryland*, 33 U. Balt. L. Rev. at 3. And if Ms. Alston has paid her debt to society, it may make sense to strike her conviction so that it will not impair her prospects for future employment or even public service, if subsequently chosen by the electorate. But the purposes served by Article XV, like other professional responsibility provisions, are not punishment, but preservation of the public trust. *Cf. Attorney Grievance Comm'n v. Gerald Isadore Katz*, No. 86, Sept. Term 2011, at 12 (Md., Nov. 19, 2012) (purpose of attorney grievance process is

---

[4] The General Assembly's unanimous adoption of the proposed constitutional amendment, and the voters' approval of that amendment by a greater than 7 to 1 margin, though not evidence of the legislature's intent in enacting Article XV, § 2, demonstrates that preserving the integrity of the institution remains a uniformly held policy goal. Unofficial 2012 Presidential General Election results for All State Questions (*available at* http://elections.state.md.us/elections/2012/results/general/gen_qresults_2012_4_00_1.html (last visited Nov. 19, 2012)) (reporting that 88% voted to approve Question 3).

"not to punish the errant attorney, but rather . . . to maintain public trust in the legal profession by demonstrating intolerance for unprofessional conduct") (internal quotation marks omitted); *compare* 65 *Opinions of the Attorney General* 445, 449 (1980) (observing that "the primary purpose of Article XV, § 2 clearly is to provide for the suspension from office of a convicted official; it is not concerned with the treatment of an official convicted after his term of office"). As we observed about Article XV soon after its approval:

> It is essential to our government that public officials have the confidence of the people. That confidence cannot extend to an official under conviction for malfeasance in office. His rights are subordinate to the public weal. The possibility that his conviction may ultimately be reversed cannot weigh against public dissatisfaction with, and public mistrust of him pending appellate hearing. Public policy demands a rigid construction of this law as well as its enforcement.

62 *Opinions of the Attorney General* 368-69 (1977) (quoting *State v. Levi*, 109 W. Va. 277, 279-80, 153 S.E 587, 588-89 (1930)). We cannot see how allowing Ms. Alston to retain her seat despite her guilty finding and conviction does anything to restore public trust in our elected officials or the institutions in which they serve. The voters' recent approval of Question 3, we believe, is strong evidence that the contrary is true, that the reinstatement of Ms. Alston will undermine the same public values that Article XV was intended to enforce. Question 3 amends Article XV to accelerate the process by which officials found guilty of criminal wrongdoing are removed from office. Just as the initial approval of Article XV, § 2 "was proposed and ratified by the voters of this State in 1974 following the convictions of certain elected officials," 62 *Opinions of the Attorney General* at 367-68 (citing *Green v. State*, 25 Md. App. 679 (1975), and *Maryland State Bar Association v. Agnew*, 271 Md. 543 (1974)), *see also* Letter of Advice to Del. Jill P. Carter from Assistant Attorney General Kathryn M. Rowe (Nov. 20, 2012), the approval of Question 3 came after a series of instances in which prominent officials were found guilty of a jury of their peers but refused to leave office, managing instead to remain in office for extended periods of time prior to sentencing. The voters' overwhelming approval of Question 3, and the modifications to Article XV it proposed, provides recent and resounding confirmation of the meaning we ascribe to Article XV. [5]

---

[5] Because our conclusions are based on other grounds, it is unnecessary to consider whether the ratification of the amendments to

\*   \*   \*

Finally, we confirm Mr. Friedman's conclusion that Ms. Alston's removal from elective office pursuant to Art. XV, § 2 applies only to the current term of office. That conclusion reflects the interpretation long held by this Office that the term is part of the office itself. See 83 *Opinions of the Attorney General* 109 (1998); Letter of Advice to Theodore P. Weiner from Assistant Attorney General Linda H. Lamone (Aug. 15, 1986). Accordingly, absent further developments, Ms. Alston will be eligible to run for election in 2014 or beyond. However, that same interpretation yields the conclusion that Ms. Alston may not be re-appointed to her seat during the current term of office. See Letter of Advice to Del. Jill P. Carter from Assistant Attorney Kathryn M. Rowe (Nov. 20, 2012).

## III

### Conclusion

For all of these reasons, we think that the better and more natural interpretation of the constitutional provision as applied to this set of circumstances is that Ms. Alston's suspension from elective office became a final removal when she forfeited her rights to appeal from the conviction. Therefore, in our view, she was removed from office by operation of law on October 9, 2012.

Douglas F. Gansler
*Attorney General*

Adam D. Snyder
*Chief Counsel*
  *Opinions & Advice*

---

Article XV, § 2 would alter the timing of Ms. Alston's initial suspension.